UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SALVATORE MIRABELLA, JR., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| TOWN OF LEXINGTON, | * | Civil Action No. 19-cv-12439-ADB |
| MASSACHUSETTS, and MARK CORR, | * | |
| Chief of Police, | * | |
| | * | |
| Defendants. | * | |
| | * | |
| | * | |

## MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

Plaintiff Salvatore Mirabella, Jr. ("Plaintiff") filed suit against the Town of Lexington, Massachusetts ("Lexington" or "Town") and Lexington's Chief of Police Mark Corr ("Chief Corr," and collectively with Lexington, "Defendants"), claiming that they violated his Fourteenth Amendment right to due process when he was terminated from his position as a Special Police Officer and also interfered with his ability to obtain employment elsewhere. [ECF No. 1]. Presently before the Court are Defendants' motions for summary judgment. [ECF Nos. 21, 25]. For the reasons set forth below, the motions are GRANTED.

## I. BACKGROUND

### A. Factual Background

Unless otherwise noted, the following facts are undisputed. [1]

---

[1] The Court draws the facts from the Town's statement of material facts (which is identical to the statement of material facts filed by Chief Corr), [ECF Nos. 23, 27], Plaintiff's response to the Town's statement of material facts (which is identical to Plaintiff's response to Chief Corr's

1.  <u>Plaintiff's Career as a Lexington Police Officer</u>

Plaintiff was first hired by the Lexington Police Department ("LPD") as a Cadet in 1996 and was later appointed to a full-time Police Officer position in 2002.  [ECF No. 36 ¶¶ 2–5; ECF No. 37 ¶¶ 2–5].  During his time as a Police Officer, Plaintiff was a member of the Northeast Massachusetts Law Enforcement Counsel and its crisis negotiation team, among other roles. [ECF No. 34-1 at 14].

In 2015, Plaintiff requested a vacation day on Patriot's Day so that he could run in the Boston Marathon.  [ECF No. 36 ¶ 8; ECF No. 37 ¶ 8].  Lexington holds several events on Patriot's Day and the LPD has a long-standing policy that requires active officers to work that day.  [ECF No. 36 ¶ 9; ECF No. 37 ¶ 9].  Chief Corr approved the vacation day on the condition that Plaintiff not request Patriot's Day off in the future and that he make the LPD proud.  [ECF No. 36 ¶¶ 8–9; ECF No. 37 ¶¶ 8–9].  Then, in 2018, Plaintiff again asked to take Patriot's Day off so that he could run in the Boston Marathon.  [ECF No. 36 ¶ 12; ECF No. 37 ¶ 12; ECF No. 26-1 at 185].  On February 15, 2018, Chief Corr, via a written memo, denied Plaintiff's request, explaining that he had already been allowed to take a Patriot's Day off and that the LPD could not allow this second request due to staffing needs.  [ECF No. 36 ¶ 13; ECF No. 37 ¶ 13; ECF No. 26-1 at 185].  On February 28, 2018, Plaintiff submitted his resignation letter, effective April 14, 2018, and requested appointment as a Special Police Officer.  [ECF No. 36 ¶ 14; ECF No. 37 ¶ 14; ECF No. 26-1 at 187].  Plaintiff testified in his deposition that he resigned because he had

---

statement of material facts), [ECF Nos. 36, 37], and the documents referenced therein.  In addition to responding to Defendants' statements of material facts, Plaintiff appears to have filed a separate statement of facts as part of his briefing in opposition to summary judgment.  [ECF No. 34 at 1–13; ECF No. 35 at 1–13].  To the extent that they do not conflict with Plaintiff's responses to Defendants' statements of material facts, the Court also draws facts from these statements and the documents referenced therein.

served as a Police Officer for twenty years and his pension had vested, [ECF No. 26-1 at 21], but his resignation letter does not give a reason for his decision, see [ECF No. 26-1 at 187].

2.    Plaintiff's Appointment to Special Police Officer

In April 2018, Lexington's then-Town Manager, Carl Valente, appointed Plaintiff as a Special Police Officer.  [ECF No. 26-1 at 241; ECF No. 36 ¶ 18; ECF No. 37 ¶ 18].  Plaintiff's appointment letter stated that the Town Manager "retained the right to suspend or revoke [Plaintiff's] appointment at [his] discretion during [Plaintiff's] 3-year term of service."  [ECF No. 36 ¶ 18; ECF No. 37 ¶ 18; ECF No. 26-1 at 241].  Plaintiff testified that in his experience Lexington always renewed a Special Police Officer's term of service.  [ECF No. 26-1 at 25].

Pursuant to Policy and Procedure 16A of the LPD's Manual, a Special Police Officer is a retired Police Officer

> who has been recommended for appointment to the Town Manager by the Chief of Police, is physically fit as determined by a physician, meets training standards and maintains a standard of conduct (as citizens) consistent with the expectations of all Police Officer Appointments. The appointment […] will be reviewed annually by the Chief of Police to determine fitness for duty.

[ECF No. 36 ¶ 16; ECF No. 37 ¶ 16; ECF No. 26-1 at 199].  Special Police Officers do not work police shifts or respond to calls, but instead are assigned to work on "details," such as security, traffic direction, or road details.  [ECF No. 26-1 at 25].  Special Police Officers are required to comply with the terms of the LPD's Manual, the LPD's rules and regulations, and Lexington's policies, including its Sexual Harassment Policy.  [ECF No. 36 ¶ 15; ECF No. 37 ¶ 15].

3.    The August 2018 Detail and Subsequent Investigation

In the summer of 2018, the Massachusetts Department of Transport ("MassDOT") oversaw a construction project in Lexington.  [ECF No. 36 ¶ 19; ECF No. 37 ¶ 19].  PJ Albert was the project's main contractor and K. DaPonte was a subcontractor.  [ECF No. 36 ¶ 19; ECF

No. 37 ¶ 19].  Plaintiff was assigned to a detail near the project site, which was the same location where K. DaPonte employee Crystal Charron ("Ms. Charron") was working.  [ECF No. 36 ¶ 20; ECF No. 37 ¶ 20].  In August 2018, Plaintiff, Ms. Charron, and another individual were discussing a tattoo of a naked mermaid on Ms. Charron's arm.  [ECF No. 36 ¶ 22; ECF No. 37 ¶ 22].  Although some of the finer points of the interaction are in dispute, all parties agree that during this conversation Plaintiff told Ms. Charron to "show him your tatas!"  [ECF No. 36 ¶ 22; ECF No. 37 ¶ 22].[2]  A MassDOT employee named Jim Tortola ("Mr. Tortola") was also involved in the interaction.  [ECF No. 36 ¶ 25; ECF No. 37 ¶ 25].

On October 26, 2018, several weeks after the August 2018 detail, Officer Colatosti commented "I guess the retired officers don't have to read the sexual harassment policy."  [ECF No. 26-1 at 155–56].  Officer Colatosti does not like Plaintiff personally and did not get along with him.  [ECF No. 26-1 at 103].  This comment was made in front of others, including Police Sergeant George Snell ("Sergeant Snell"), who was in charge of police details.  [ECF No. 36 ¶ 23; ECF No. 37 ¶ 23; ECF No. 26-1 at 103, 155–56].  Officer Colatosti said that Ed Mann ("Mr. Mann"), the MassDOT employee in charge of the Lexington construction project, wanted to talk to Sergeant Snell about a comment Plaintiff made during a detail.  [ECF No. 26-1 at 156; ECF No. 36 ¶ 24; ECF No. 37 ¶ 24].  Sergeant Snell reported Officer Colatosti's statement to LPD Captain McLean and McLean directed Sergeant Snell to investigate the incident.  [ECF No. 36 ¶ 23; ECF No. 37 ¶ 23; ECF No. 26-1 at 156].  At some point, Chief Corr recommended that the Town's labor counsel be involved in the investigation because Plaintiff "had an extensive history of telling everybody that he sues people" and Chief Corr "wanted to make sure" that the

---

[2] Although Plaintiff admits that he said this, [ECF No. 36 ¶ 22 (response); ECF No. 37 ¶ 22 (response)], he also proffers a version of events where he instead said, "I wonder if people ever think like 'let me see your boobies.'"  [ECF No. 34 at 3].

"investigation didn't have any unnecessary flaws in it" and "wanted it to be a proper investigation." [ECF No. 26-1 at 104].

On October 29, 2019, Sergeant Snell spoke with Mr. Mann, who reported that Plaintiff asked to see Ms. Charron's breasts during the August 2018 detail. [ECF No. 36 ¶ 24; ECF No. 37 ¶ 24]. Mr. Mann told Sergeant Snell that MassDOT did not want Plaintiff back on the detail in part because of the incident with Ms. Charron. [ECF No. 36 ¶ 24; ECF No. 37 ¶ 24]. During the investigation, Sergeant Snell tried to speak with other MassDOT and PJ Albert employees, but they stated that they did not know about the incident, and Mr. Tortola, the MassDOT employee who was allegedly involved in the incident, declined to speak with him. [ECF No. 36 ¶ 25; ECF No. 37 ¶ 25].

On November 15, 2018, Sergeant Snell spoke to Plaintiff about the incident in person, and Plaintiff stated that he knew Ms. Charron and she had no problem with the conversation. [ECF No. 36 ¶ 28; ECF No. 37 ¶ 28]. At the meeting, Sergeant Snell asked Plaintiff for a written statement, and Defendants assert that Plaintiff was told he could take time to consult his attorney about the written statement. [ECF No. 36 ¶ 28; ECF No. 37 ¶ 28]. Plaintiff disputes this account and contends that he was told he had to prepare a written statement that day. [ECF No. 36 ¶ 28 (response); ECF No. 37 ¶ 28 (response); ECF No. 26-1 at 257].

In his written statement, which was sent to Sergeant Snell a few hours after the November 15 meeting, Plaintiff recalled the following: (1) on that day, it was very hot and Ms. Charron was working with her sleeves rolled up, which exposed the tattoo on her arm; (2) Ms. Charron referred to the tattoo as a conversation starter because "everyone asks to see" her breasts, so when they ask she "show[s] them;" (3) as she said this she rolled up her sleeve to reveal the whole tattoo of a naked mermaid; (4) after this conversation, Mr. Tortola whispered to

5

Plaintiff that he would love to see Ms. Charron's breasts; (5) at which point Plaintiff told Ms. Charron "show him your tatas!" and she rolled up her sleeve and showed her tattoo.  [ECF No. 26-1 at 257].  Plaintiff reported that Ms. Charron was laughing.  [Id.].

As part of the investigation, Sergeant Snell spoke with Ms. Charron on two occasions in November 2018.  [ECF No. 36 ¶ 32; ECF No. 37 ¶ 32].  She confirmed that Plaintiff had asked to see her "boobs" or "boobies" and in response she had showed him the tattoo.  [ECF No. 36 ¶ 32; ECF No. 37 ¶ 32].  When a PJ Albert employee asked if she was okay following the incident, she replied that "she works with guys all the time and could handle herself."  [ECF No. 36 ¶ 32; ECF No. 37 ¶ 32].  Ms. Charron later testified that she was not "victimized" or "harassed" by Plaintiff's statement.  [ECF No. 34-1 at 88].

Sergeant Snell submitted an investigation report to Chief Corr on November 28, 2018.  [ECF No. 36 ¶ 34; ECF No. 37 ¶ 34].  That same day, Plaintiff and his attorney met with Chief Corr.  [ECF No. 36 ¶ 35; ECF No. 37 ¶ 35].  Plaintiff accused Chief Corr, two LPD Captains, and Sergeant Snell of being "out to get him," and complained that Sergeant Snell made him submit a written statement on the same day it was requested.  [ECF No. 36 ¶ 35; ECF No. 37 ¶ 35].

On December 20, 2018, Plaintiff and his attorney met with Chief Corr and Lexington's labor counsel.  [ECF No. 36 ¶ 36; ECF No. 37 ¶ 36; ECF No. 26-1 at 309].  Prior to this meeting, Chief Corr asked the current Town Manager, James Malloy ("Town Manager Malloy"), for permission to arrange a meeting with Plaintiff and counsel because Malloy would need to approve the expense.  [ECF No. 26-1 at 111; ECF No. 34 at 8].  During that discussion with Town Manger Malloy, Chief Corr showed him Plaintiff's November 15 written statement, expressed that he wanted to talk with Plaintiff but "expected that [he] would be recommending a

disciplinary hearing" and "expected [Plaintiff] to litigate anything" that the LPD did.  [ECF No. 26-1 at 111].  Chief Corr was not making any recommendation to Town Manger Malloy at that time, but he recognized that the investigation was significant and presented serious circumstances.  [Id.].  Town Manager Malloy instructed Chief Corr to proceed with the investigation, to use labor counsel, and that if litigation was the result, then Lexington would defend itself in court.  [Id.].

The December 20 meeting was not an interview or hearing, but a chance for Plaintiff to respond to Chief Corr's view of the investigation.  [ECF No. 36 ¶ 36; ECF No. 37 ¶ 36].  Chief Corr explained that Plaintiff had admitted to making an inappropriate comment to Ms. Charron and that such conduct has repercussions when individuals are representing Lexington and the LPD.  See [ECF No. 36 ¶ 36; ECF No. 37 ¶ 36].  In response, Plaintiff asked who had complained, who the victim was, and did not apologize for the statement.  [ECF No. 36 ¶ 37; ECF No. 37 ¶ 37].

On December 26, 2018, Chief Corr wrote a report about the December 20 meeting with Plaintiff and identified several LPD policies and regulations that Plaintiff had violated including Prohibited Conducted (Conduct Unbecoming an Officer), Required Conduct (Controversial Discussion & Courtesy), Professional Responsibilities, and Harassment and Sexual Harassment. [ECF No. 36 ¶ 38; ECF No. 37 ¶ 38; ECF No. 26-1 at 309–12].  Chief Corr was unable to conclude that Plaintiff understood the seriousness of his statement or that he could be expected to avoid similar conduct in the future.  [ECF No. 36 ¶ 38; ECF No. 37 ¶ 38; ECF No. 26-1 at 312]. Chief Corr also submitted a memorandum to Town Manager Malloy on January 5, 2019 that explained that Plaintiff's statement violated the LPD's rules and regulations regarding

"Professional Responsibilities" and that Plaintiff had expressed no remorse.  [ECF No. 36 ¶ 39; ECF No. 37 ¶ 39; ECF No. 26-1 at 314].

On January 10, 2019, Town Manager Malloy sent Plaintiff a letter notifying him that his termination was being contemplated and that Plaintiff could request a meeting to provide information prior to any disciplinary action.  [ECF No. 36 ¶ 40; ECF No. 37 ¶ 40; ECF No. 26-1 at 316–17].  A meeting was held on May 23, 2019 and Plaintiff, who was represented by counsel, was given the opportunity to provide relevant information prior to any disciplinary action.  [ECF No. 36 ¶ 41; ECF No. 37 ¶ 41].  Plaintiff did not produce witnesses, did not present evidence, and did not dispute or express remorse for what he said to Ms. Charron, but stated that if he had known it "was going to turn into a big deal, he would not have said it."  [ECF No. 36 ¶ 41; ECF No. 37 ¶ 41].  Prior to the May 23 meeting, Chief Corr spoke with Town Manger Malloy and explained that Plaintiff's written statement "in his own words, coupled with his interview with [Chief Corr] where he completely had no understanding of how his behavior could have been perceived as wrong, was extremely troubling to [Chief Corr] and hopefully [Plaintiff] could offer something helpful in the hearing."  [ECF No. 26-1 at 115].  Town Manager Malloy responded that he understood what Chief Corr was saying, but Chief Corr does not recall Town Manager Malloy ever saying that he had already decided to terminate Plaintiff prior to the May 23 meeting.  [Id.].

On June 3, 2019, Town Manager Malloy informed Plaintiff via a letter that Lexington was terminating him as a Special Police Officer.  [ECF No. 36 ¶ 42; ECF No. 37 ¶ 42; ECF No. 26-1 at 189–92].  The letter included Town Manager Malloy's findings of fact and his conclusion that there was no dispute that while in uniform and serving on a detail Plaintiff yelled "show him your tatas" to a female construction worker, which violated LPD's rules and regulations.  [ECF

No. 36 ¶ 42; ECF No. 37 ¶ 42; ECF No. 26-1 at 191]. The letter explained that Plaintiff considered the comment a joke, but also concluded that his intent and the context were not relevant and that the Town Manger was concerned that Plaintiff's attempts to minimize his conduct demonstrated a lack of remorse or understanding of the seriousness. [ECF No. 36 ¶ 43; ECF No. 37 ¶ 43].

    4.    <u>Prior Interactions between Plaintiff, Chief Corr, Sergeant Snell, and Town Manager Malloy</u>

Prior to the investigation into the August 2018 incident, Sergeant Snell's son applied for a job at LPD. <u>See</u> [ECF No. 36 ¶ 10; ECF No. 37 ¶ 10]. On September 21, 2017, Plaintiff sent an e-mail to LPD Captain John Mazerall ("Captain Mazerall") noting that Sergeant Snell's son did not comply with the LPD's residency requirements and therefore was ineligible for a position. [ECF No. 36 ¶ 10; ECF No. 37 ¶ 10; ECF No. 34-1 at 167–68]. Sergeant Snell's son was eventually hired and Sergeant Snell testified that he was not aware of Plaintiff's email until it was sent to him in discovery. [ECF No. 26-1 at 167–68]. Although he was not aware of the email, in early 2018, Sergeant Snell heard "talk" that Plaintiff was "trying to screw [his] kid over." [<u>Id.</u> at 167–68].

Sergeant Snell's son was almost not hired for another reason. The then-Town Manager was planning to impose a nepotism policy and did not want to hire Sergeant Snell's son. [ECF No. 26-1 at 108]. In light of the nepotism policy, Sergeant Snell offered to retire within the year, and his son was hired. [<u>Id.</u>]. When Chief Corr learned of the proposed nepotism policy, he informed the then-Town Manager that he thought it was unwise given LPD's staffing shortages and that losing Sergeant Snell would lead to a loss of institutional knowledge. [ECF No. 26-1 at 113–14]. Chief Corr offered to place Sergeant Snell in a position where he would not be directly supervising his son. [<u>Id.</u>]. Ultimately, Sergeant Snell did not have to retire because Malloy

became the Town Manager and rescinded the nepotism policy.  [Id.].  Town Manger Malloy agreed with Chief Corr's view that the nepotism policy was unfair and that the LPD needed a veteran officer.  [Id.].

       5.      Plaintiff's Post-LPD Job Search

Plaintiff has applied to work at several police departments both before and after he was terminated from the Special Police Officer position.

In December 2017, before he resigned as a Police Officer, Plaintiff applied to the Bentley Police Department ("BPD").  [ECF No. 36 ¶ 46; ECF No. 37 ¶ 46; ECF No. 26-1 at 349].  On February 26, 2018, two days before he sent his resignation letter to the LPD, he filled out an "Employment Verification Questionnaire" stating that he left full-time employment with the LPD because he wanted to run the Boston Marathon but could not get the day off.  [ECF No. 36 ¶ 46; ECF No. 37 ¶ 46; ECF No. 26-1 at 350].  He also signed a release allowing BPD to access records and information regarding prior employment and releasing prior employers from any liability related to producing that information.  [ECF No. 36 ¶ 46; ECF No. 37 ¶ 46].  During the background investigation, two BPD officers spoke with Chief Corr, who explained that Plaintiff left full-time employment after his request for a vacation day on Patriot's Day was denied, that Plaintiff, in response, told an LPD Captain he did not need the job, and that Plaintiff had told an LPD Captain that he intended to stir things up upon arriving at BPD.  [ECF No. 36 ¶ 46; ECF No. 37 ¶ 46; ECF No. 26-1 at 357].

BPD officers also conducted a home visit of Plaintiff's residence to determine whether his firearms were legally and safely stored.  [ECF No. 36 ¶ 46; ECF No. 37 ¶ 46].  Plaintiff refused to allow an inspection of the second floor of his home, which is where the firearms were stored.  [ECF No. 36 ¶ 46; ECF No. 37 ¶ 46; ECF No. 26-1 at 358].  Plaintiff asserts that he

refused the inspection because his children were home from school due to snow and he did not want the firearms taken out in front of them.  [ECF No. 36 ¶ 46 (response); ECF No. 37 ¶ 46 (response)].  Because the home investigation could not confirm legal storage of his firearms, Plaintiff was disqualified from consideration for employment at BPD, and was notified of this decision via e-mail on March 27, 2018.  [ECF No. 36 ¶ 46; ECF No. 37 ¶ 46; ECF No. 26-1 at 360, 362].

On March 2, 2018, Plaintiff signed an authorization to allow his prior employment records to be produced to the Massachusetts Institute of Technology Police Department ("MIT PD").  [ECF No. 36 ¶ 47; ECF No. 37 ¶ 47; ECF No. 26-1 at 364].  The authorization released the "custodian of such records" from liability and damages associated with the release of the records.  [ECF No. 26-1 at 364; ECF No. 36 ¶ 47; ECF No. 37 ¶ 47].  On March 13, 2018, Plaintiff submitted an employment application to MIT PD, which stated that his reason for leaving the LPD was "retirement."  [ECF No. 26-1 at 366, 368; ECF No. 36 ¶ 47; ECF No. 37 ¶ 47].  During the background investigation, Chief Corr told the MIT PD investigator that Plaintiff had requested off on Patriot's Day to run the Boston Marathon, and after the request was denied, Chief Corr received Plaintiff's letter of resignation.  [ECF No. 26-1 at 375; ECF No. 36 ¶ 47; ECF No. 37 ¶ 47].  Plaintiff testified that he was told he did not get the job because MIT PD went with other more qualified applicants.  [ECF No. 26-1 at 335].

On August 8, 2018, Plaintiff submitted a cover letter and resume for a police officer position with the Lincoln Police Department.  [ECF No. 36 ¶ 48; ECF No. 37 ¶ 48; ECF No. 26-1 at 406].  In his deposition, Lincoln Police Chief Andrew Kevin Kennedy ("Chief Kennedy") explained that he decided not to consider Plaintiff for a job without speaking to anyone at the LPD and that the decision was based on Plaintiff's decision to leave a larger police department

for a smaller one with less opportunities.  [ECF No. 36 ¶ 48; ECF No. 37 ¶ 48; ECF No. 26-1 at

413].  Plaintiff denies this account but does not point to any exhibit or other evidence to support

his denial.  [ECF No. 36 ¶ 48 (response); ECF No. 37 ¶ 48 (response)].

Plaintiff also applied to be an On-Call Campus Police Officer at the Merrimack College

Police Department ("MCPD").  [ECF No. 36 ¶ 45; ECF No. 37 ¶ 45].  As part of the hiring

process, Plaintiff signed a release that allowed MCPD to obtain prior employment records and

agreed to hold harmless any person to whom that request was presented for any claims arising

out of compliance with responding to the request.  [ECF No. 36 ¶ 45; ECF No. 37 ¶ 45; ECF No.

26-1 at 322].  As part of the background investigation, MCPD Lieutenant Michael Kelly spoke

with LPD Lieutenant Kevin Veno and Captain Mazerall and reviewed Plaintiff's personnel file.

[ECF No. 36 ¶ 45; ECF No. 37 ¶ 45; ECF No. 26-1 at 319].  On February 25, 2019, Plaintiff was

hired as an On-Call Campus Police Officer.  [ECF No. 36 ¶ 45; ECF No. 37 ¶ 45; ECF No. 26-1

at 320].  After Plaintiff's 90-day probationary period expired, MCPD Chief Michael DelGreco

("Chief DelGreco") declined to continue Plaintiff's employment and terminated him effective

June 28, 2019.  [ECF No. 26-1 at 320].  Chief DelGreco avers that this decision was not based on

input, information, or documents provided by Chief Corr or any other representative of the LPD

and was instead due to feedback gathered from Plaintiff's MCPD supervisors.  [ECF No. 26-1 at

319–20].  Plaintiff disputes this account and argues that he learned from an MCPD lieutenant

that he was terminated when someone at LPD informed MCPD that Plaintiff's Special Police

Officer status had been revoked.  [ECF No. 36 ¶ 45 (response); ECF No. 37 ¶ 45 (response)].

On April 11, 2019, Plaintiff applied to be a Reserve Police Officer at the Rowley Police

Department ("RPD").  [ECF No. 36 ¶ 49; ECF No. 37 ¶ 49; ECF No. 26-1 at 424].  His

employment application states that he left his full-time Police Officer position at LPD so that he

could "run the Boston Marathon for charity every year." [ECF No. 26-1 at 425; ECF No. 36 ¶ 49; ECF No. 37 ¶ 49]. Plaintiff testified that in his interview with RPD he told them the real reason he left was because his pension vested, but that he put the Boston Marathon on his application because that is what Chief Corr "was going to tell them." [ECF No. 26-1 at 327]. On May 21, 2019, Plaintiff was conditionally offered employment at the RPD contingent on a satisfactory background investigation. [ECF No. 26-1 at 427; ECF No. 36 ¶ 49; ECF No. 37 ¶ 49]. He submitted a "full application" on May 28, 2019, which included a release authorizing the RPD to conduct the background investigation and agreeing that "previous employers shall not be liable with regard to any information provided by them in connection with this release." [ECF No. 36 ¶ 49; ECF No. 37 ¶ 49; ECF No. 26-1 at 435]. The full application noted that his reason for leaving the LPD was "[t]o pursue various life goals." [ECF No. 26-1 at 433]. RPD Sergeant Matthew Ziev ("Sergeant Ziev") conducted the investigation and recommended Plaintiff for employment. [ECF No. 26-1 at 444]. During the investigation, Sergeant Ziev spoke to Chief Corr and reviewed Plaintiff's LPD personnel file. [Id.]. In his investigatory report, Ziev explained that

> [Plaintiff] indicated that he left [LPD] due to wanting to run the Boston Marathon, having signed up for the same and subsequently being denied the day off. There was a letter in [Plaintiff's] folder indicating that he was denied the day off of the Boston Marathon; furthermore, Chief Corr also indicated the same that [Plaintiff] was denied the day off of the Boston Marathon and left for the same reason.

[Id.]. RPD's Police Chief Scott Dumas ("Chief Dumas") ultimately determined that Plaintiff would not be a good fit for several reasons, one of which was that he considered Plaintiff's decision to leave a full-time position in order to run in the Boston Marathon to be concerning because RPD's reserve officers need to work on holidays and weekends, and it exhibited poor decision making in his opinion. [ECF No. 26-1 at 450]. On July 3, 2019, Chief Dumas sent

Plaintiff a letter withdrawing the conditional offer. [ECF No. 26-1 at 460]. Chief Dumas contacted Chief Corr prior to withdrawing the offer and asked him about Plaintiff's reason for leaving. [ECF No. 26-1 at 450]. In response, Chief Corr reportedly told Chief Dumas that what was in Plaintiff's personnel file, which included the letter denying his day off request and his resignation letter, was "pretty much it." [Id.]. Plaintiff asserts that his conditional offer was withdrawn because Chief Corr "made a big deal out of the [August 2018] detail situation" and that Chief Dumas told an RPD lieutenant that Plaintiff was not getting the job because he did not like that he "walked away…to run the marathon." [ECF No. 36 ¶ 49 (response); ECF No. 37 ¶ 49 (response)]. Sergeant Ziev also reportedly told Plaintiff that he was "sunk by the chief." [ECF No. 36 ¶ 49 (response); ECF No. 37 ¶ 49 (response)].

On April 3, 2020, Plaintiff signed a release authorizing the Wenham Police Department ("WPD") to obtain relevant information about his former employment and releasing former employers from liability for complying. [ECF No. 36 ¶ 50; ECF No. 37 ¶ 50; ECF No. 26-1 at 462]. While reviewing Plaintiff's LPD personnel file, the WPD officer conducting the background investigation learned about the August 2018 detail investigation. [ECF No. 36 ¶ 50; ECF No. 37 ¶ 50; ECF No. 26-1 at 471]. The investigator also spoke with Chief Corr and Captain Mazerall, but the background investigation report does not note any comments made by either of them. [ECF No. 26-1 at 471]. The investigator concluded that before hiring Plaintiff, WPD administrators needed to consider certain information, including the investigation that had led to his termination as a Special Police Officer. [ECF No. 26-1 at 475]. Although it is not clear from the record, Plaintiff does not appear to have been hired by WPD.

### B.    Procedural History

On December 2, 2019, Plaintiff filed a two-count complaint alleging that Defendants interfered with his advantageous relations when he was applying to other police departments (Count I), [ECF No. 1 ¶¶ 21–25], and deprived him of his substantive and procedural due process rights under the Fourteenth Amendment in violation of 42 U.S.C. § 1983 (Count II), [id. ¶¶ 26–29].  On April 30, 2021, Chief Corr and Lexington each filed a motion for summary judgment. [ECF Nos. 21 (Chief Corr's motion), 25 (Lexington's motion)].  Plaintiff opposed both motions on May 25, 2021, [ECF No. 34, 35], and Defendants filed their replies on June 14, 2021, [ECF Nos. 40, 41].

## II.    LEGAL STANDARD

Summary judgment is appropriate where the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Robinson v. Cook, 863 F. Supp. 2d 49, 60 (D. Mass. 2012) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted).  Thus, "[a] genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted). By invoking summary judgment, "the moving party in effect declares that the evidence is insufficient to support the nonmoving party's case." United States v. Plat 20, Lot 17, Great Harbor Neck, New Shoreham, R.I., 960 F.2d 200, 204 (1st Cir. 1992) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

"To succeed in showing that there is no genuine dispute of material fact the moving party must . . . . 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015) (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  Conversely, "[t]o defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." ATC Realty, LLC v. Town of Kingston, N.H., 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks and citation omitted). That is, the nonmoving party must set forth specific, material evidence showing that there is "a genuine disagreement as to some material fact." Plat 20, Lot 17, Great Harbor Neck, 960 F.2d at 204 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)).

In reviewing the record, the Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6.  The First Circuit has noted that this review "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  "The factual conflicts upon which he relies must be both genuine and material[,]" Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 397 (1st Cir. 2012), and the Court may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6 (quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

### III.      DISCUSSION

####    A.      Count I: Intentional Interference with Advantageous Relations

#####         1.      Claim Against Lexington

Lexington argues that Count I must be dismissed because the Massachusetts Tort Claims Act ("MTCA") precludes public employers being held liable for intentional torts.  [ECF No. 26 at 11–12].  Plaintiff does not directly respond to the Town's MTCA argument.  See [ECF No. 35].

Under the MTCA, "[p]ublic employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment . . . ."  Mass. Gen. Laws ch. 258, § 2.  Under Section 10 of the MTCA, public employers are immune from liability for "any claim arising out of an intentional tort, including . . . interference with advantageous relations or interference with contractual relations."  Id. § 10(c).  Thus, Lexington cannot be held liable for intentional interference with advantageous relations and Plaintiff's claim against it fails as a matter of law.[3]

---

[3] Although it is not entirely clear, if Plaintiff is asserting claims against Chief Corr in his official capacity, then those claims are analyzed as claims against the Town and any intentional interference claim against Chief Corr in his official capacity also fails as a matter of law.  See Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005) ("A suit against a public official in his official capacity is a suit against the governmental entity itself." (citing Wood v. Hancock County Sheriff's Dep't, 354 F.3d 57, 58 n. 1 (1st Cir. 2003))).

2.    <u>Claim Against Chief Corr</u>

Chief Corr argues that summary judgment must be granted on Count I because Plaintiff

cannot prove the elements of an intentional interference claim.[4]  [ECF No. 22 at 11, 13–17].

> A claim of intentional interference with an advantageous business relationship must
> assert that 1) plaintiff had a business relationship or anticipated a contract of
> economic benefit, 2) defendant knew of the relationship, 3) defendant interfered
> with the relationship through an improper motive or means and 4) plaintiff suffered
> a loss of advantage as a direct result of defendant's conduct.

<u>Cummings v. City of Newton</u>, 298 F. Supp. 3d 279, 289–90 (D. Mass. 2018) (citing <u>Am. Private

Line Servs., Inc. v. E. Microwave, Inc.</u>, 980 F.2d 33, 36 (1st Cir. 1992)).  "Such improper

conduct may exist if a party 'used threats, misrepresented any facts [or] defamed anyone' in the

course of the interference."  <u>Kahalas v. Schiller</u>, 164 F. Supp. 3d 241, 246 (D. Mass. 2016)

(quoting <u>United Truck Leasing Corp. v. Geltman</u>, 551 N.E.2d 20 (Mass. 1990)).

Chief Corr argues that Plaintiff cannot show improper means or motive because the

record demonstrates that (1) Chief Corr did not call any of the potential employers unprovoked;

and (2) his decision to share information about Plaintiff's employment was tied to a legitimate

municipal interest.  [ECF No. 22 at 15].  Chief Corr also asserts that Plaintiff cannot show a

harm that is a direct result of Chief Corr's conduct because his statements did not play a role in

the other police departments' decisions not to hire him.  [<u>Id.</u> at 16].  Plaintiff counters that Chief

Corr employed improper motives because he (1) volunteered information not included in

---

[4] Chief Corr also contends that Plaintiff cannot succeed on this claim because he signed
agreements with the different police departments that authorized a background check and
released former employers from any liability in connection with any requests related to the
background checks.  [ECF No. 22 at 11; ECF No. 26 at 13–14].  Plaintiff argues that this defense
was waived because it was not properly pled in Chief Corr's Answer.  [ECF No. 34 at 15; ECF
No. 35 at 14–15].  Because the Court ultimately finds summary judgment must be granted for
other reasons, it declines to analyze this argument other than to note that, assuming it was not
waived, it appears to provide a strong basis for granting summary judgment on Count I.

Plaintiff's personnel file; (2) followed "different rules" when providing Plaintiff's references than when providing references for other officers; and (3) he lied to the potential employers. [ECF No. 34 at 17–18].  The Court agrees that no reasonable factfinder could determine that Plaintiff suffered "a loss of advantage as a direct result" of Chief Corr's conduct or that Chief Corr interfered through improper means.[5]

First, as to Plaintiff's relationship with MCPD, although it is undisputed that he received an offer of employment from MCPD, an affidavit from MCPD Chief DelGreco, signed under pains of perjury, states unequivocally that (1) he is the final decisionmaker regarding hiring and firing of campus police officers; (2) he decided to end Plaintiff's employment after gathering feedback from his supervisors at MCPD; (3) the termination decision was not based on "any input, information, or documents, provided by Chief Mark Corr or any other representative of the [LPD]"; and (4) he never spoke to or corresponded with Chief Corr or any other LPD representatives about Plaintiff's employment prior to his termination.  [ECF No. 26-1 at 319–20 ¶¶ 2, 10, 12–13].  In response, Plaintiff does not engage with Chief DelGreco's affidavit in any way and instead insists that he was terminated from his probationary position because someone at LPD told someone at MCPD that Plaintiff had been fired as a Special Police Officer.  [ECF No. 34 at 11].  Even after drawing all reasonable inferences in his favor, the record does not show that Chief Corr's conduct was a direct cause of any harm because Plaintiff's own testimony is that it was LPD Captain Mazerall, not Chief Corr, who informed MCPD about Plaintiff's termination.  [ECF No. 26-1 at 21–22].

---

[5] Plaintiff relies on his advantageous relationships with the MCPD, BPD, and RPD.  [ECF No. 34 at 17].  He does not put forth any argument regarding his applications with WPD, MIT PD, or the Lincoln Police Department, but for the sake of completeness, the Court will also analyze his relationships with those police departments.

Second, with regard to RPD, Plaintiff states that his conditional employment offer was revoked after RPD Chief Dumas and Chief Corr discussed the August 2018 investigation and Plaintiff's reason for resigning from the full-time Police Officer position.  [ECF No. 34 at 10]. Plaintiff appears to assert that Chief Corr lied to the RPD because he did not quit because of the Boston Marathon, and that it was improper for Chief Corr to "volunteer[]" that information. [ECF No. 34 at 17].  Even drawing all reasonable inferences in Plaintiff's favor, no reasonable factfinder could conclude that Chief Corr's statements were made by improper means or motive, or that Chief Corr's conduct was the cause of any harm.  Fundamentally, Plaintiff's own initial employment application stated that the reason he left his full-time Police Officer position was so he could run the Boston Marathon.  [ECF No. 26-1 at 425].  It is also worth nothing that on his BPD application, which was completed two days before he officially resigned, Plaintiff's stated reason for leaving the LPD was to run the Boston Marathon.  [ECF No. 26-1 at 350].  Although Plaintiff now asserts that this was not the actual reason he resigned from the LPD, the record demonstrates that Chief Corr was under the impression that it was the reason Plaintiff left, [ECF No. 34-1 at 117–118; ECF No. 36 ¶ 53; ECF No. 37 ¶ 53], and Plaintiff points to no evidence that shows that Chief Corr was provided with another explanation that he then ignored or that he relayed these facts for an improper purpose, [ECF No. 34-1 at 117–118 (testimony from Chief Corr stating that he never heard that Plaintiff planned to retire when his pension vested)]. Further, the record is devoid of any information that Chief Corr improperly volunteered this information to the RPD.  Plaintiff authorized RPD to conduct a background investigation and he put this information at issue by expressly including it in his employment application.  Finally, Chief Dumas testified that he reached out to Chief Corr to ask additional questions about the Boston Marathon (rather than Chief Corr reaching out to him), and that Chief Corr did not

provide any additional detail other than to say that what is included in Plaintiff's personnel file is "pretty much it."  [ECF No. 26-1 at 450].

Third, Plaintiff asserts that Chief Corr improperly interfered with his relationship with BPD because he told BPD's investigators that Plaintiff would "stir" things up when he arrived. [ECF No. 34 at 16–17].  A letter prepared by the BPD clearly states that Plaintiff "has disqualified himself from further consideration by this department" because his "lack of cooperation prevented us from completing a full home visit, including an inspection of a variety of living areas and confirming safe and legal storage of all firearms present in the home, as is required of Police Officer candidates."  [ECF No. 26-1 at 360].  Although Plaintiff proffers that he did not comply because his children were present in his home at the time, this does not change the fact that the BPD's own stated reason for not hiring him was his own lack of cooperation. Setting aside if Chief Corr's statements were false or improper, no reasonable factfinder could determine on this record that it was his statements that directly resulted in BPD declining to offer Plaintiff a job.

Finally, although Plaintiff does not clearly rely on his relationships with the Lincoln Police Department, WPD, or MIT PD to support his intentional interference claim, there is no evidence that Chief Corr's conduct interfered with any relationships with those departments either.  Plaintiff has not directed the Court to anything in the record to controvert the testimony of Lincoln Police Chief Kennedy, who testified that he made his decision without contacting anyone at LPD and instead was concerned about the fact that Plaintiff left a larger police department for a smaller one.  [ECF No. 36 ¶ 48 (response); ECF No. 37 ¶ 48 (response)].  As to WPD, Plaintiff does not dispute that his candidacy was in question due to information that came to the attention of the background investigator as he reviewed Plaintiff's personnel file and not

through any conduct by Chief Corr.  [ECF No. 36 ¶ 50 (offering no response to Defendants'

statement of facts); ECF No. 37 ¶ 50 (same)].  And, as for the MIT PD, Plaintiff's own testimony

is that the MIT PD did not hire him because they hired other more qualified applicants, and he

has not pointed to anything in the record to show that Chief Corr's conduct interfered with that

relationship.  [ECF No. 36 ¶ 47; ECF No. 37 ¶ 47; ECF No. 26-1 at 335].

Accordingly, Defendants' motions for summary judgment as to Count I are <u>GRANTED</u>.

**B.     Count II: Violation of 42 U.S.C. § 1983**

Plaintiff argues that Defendants violated his right to procedural and substantive due

process under the Fourteenth Amendment.  [ECF No. 34 at 18–20; ECF No. 35 at 17–22].

1.     <u>Procedural Due Process</u>

The Fourteenth Amendment to the U.S. Constitution provides that "No State shall . . .

deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const.

amend. XIV.  "Procedural due process" affords all citizens a right to notice and a right to be

heard before the state deprives them of a protected property interest.  See <u>Gonzalez-Droz v.

Gonzalez-Colon</u>, 660 F.3d 1, 13 (1st Cir. 2011).  To succeed on a procedural due process claim,

Plaintiff must demonstrate that: (1) he, as a government employee, possessed a property interest

in his continued employment; and, (2) Defendants, acting under color of state law, deprived him

of that property interest without a constitutionally adequate process.  See <u>Figueroa-Serrano v.

Ramos-Alverio</u>, 221 F.3d 1, 6 (1st Cir. 2000); <u>see also</u> <u>Cleveland Bd. of Educ. v. Loudermill</u>,

470 U.S. 532, 541 (1985).[6]

---

[6] Because Plaintiff cannot show that he was not afforded constitutional adequate process, the
Court assumes, without deciding, that Plaintiff possessed a property interest in his continued
employment as a Special Police Officer.

On May 23, 2019, Town Manager Malloy presided over Plaintiff's termination meeting. [ECF No. 26-1 at 189].  Plaintiff does not appear to argue that he did not receive notice and does not point to any procedures that were lacking.  In fact, it is undisputed that he was invited to a pre-termination meeting where he was represented by counsel and had the opportunity to present witnesses and evidence on his behalf but chose not to do so.  [ECF No. 36 ¶ 41; ECF No. 37 ¶ 41].  This meeting also took place in May, four months after Plaintiff was notified about the contemplated termination in January.  His claim instead is that the proceeding was biased because (1) it was premised on the skewed report prepared by Sergeant Snell, who knew that Plaintiff had tried to interfere with his son's hiring; (2) it was initiated by a complaint from Officer Colatosti, who disliked Plaintiff; and (3) Chief Corr, the actual decisionmaker, was also biased against him.  [ECF No. 34 at 18–20; ECF No. 35 at 18–22].  Plaintiff further asserts that the outcome of his hearing was predetermined and a sham because Town Manager Malloy was "predisposed" against him after Chief Corr discussed the substance of the investigation with him and told him that Plaintiff would litigate.  [ECF No. 34 at 20; ECF No. 35 at 8, 19].

"[A] fair trial in a fair tribunal is a basic requirement of due process . . . . Not only is a biased decisionmaker constitutionally unacceptable but our system of law has always endeavored to prevent even the probability of unfairness."  Withrow v. Larkin, 421 U.S. 35, 46–47 (1975) (internal quotation marks and citations omitted).  While due process does not require an "impartial" decisionmaker, " indeed, the terminating employer may preside. . .[b]ut that impartiality is not demanded does not itself determine whether bias can be so severe as to interfere with due process at the hearing itself."  Chmielinski v. Massachusetts, 513 F.3d 309, 317–18 (1st Cir. 2008).  A key concern is whether "the employee [had] an opportunity to present his side of things to correct errors of fact on which the termination decision is based. . . . In

theory at least, a decisionmaker could be so utterly biased as to deprive an employee of even that error-correction ability." Id. at 318.  Examples of bias that may rise to a constitutional dimension include "where the decisionmaker has a 'direct, personal, substantial, pecuniary interest' in the outcome," Jones v. Town of Milo, No. 09-cv-0080, 2009 WL 1605409, at *8 (D. Me. June 5, 2009), R&R adopted, No. 09-cv-0080, 2009 WL 1804125 (D. Me. June 24, 2009) (quoting Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 821–22 (1986)), or "the decisionmaker has displayed such personal animosity that objectivity cannot be presumed," id.  Additionally, "when the evidence establishes that the outcome of a municipal employee's pre-termination hearing has been predetermined regardless of the proof presented . . . there is no meaningful opportunity to invoke the decision maker's discretion, and there is no possibility that a mistaken decision can be avoided." Duhani v. Town of Grafton, 52 F. Supp. 3d 176, 183 (D. Mass. 2014) (quoting Wagner v. City of Memphis, 971 F. Supp. 308, 318–19 (W.D. Tenn. 1997)).

The relevant inquiry here is whether the decisionmaker was biased and whether that bias robbed Plaintiff of the opportunity to have his side of the story heard.  Thus, although Plaintiff highlights that Sergeant Snell was allegedly biased due to Plaintiff's email about his son's residency, he points to nothing in the record to show that Sergeant Snell was the decisionmaker or that Plaintiff was prevented from presenting evidence at the pre-termination meeting to challenge how the August 2018 investigation was carried out or to rebut the conclusions in Sergeant Snell's report.  See Gonzalez-Droz, 660 F.3d at 15 ("Certainly, 'a biased decisionmaker [is] constitutionally unacceptable.' But [defendant's] duties as the Board's investigative officer do not involve decisionmaking. A person who investigates and presents an agency's case, unlike a decisionmaker, does not have to be neutral"); West v. Hoover, No. 12-cv-00781, 2016 WL 126743, at *6 (D.R.I. Jan. 11, 2016), aff'd, 681 F. App'x 13 (1st Cir. 2017) (finding that conduct

24

by an investigator who was not alleged to be a final decisionmaker was not evidence of bias).

For this same reason, any animosity between Officer Colatosti, who was also not a

decisionmaker, and Plaintiff does not create a genuine issue of material fact regarding whether

Plaintiff's due process rights were violated.

As to Town Manager Malloy, who authored the letter to terminate Plaintiff and presided

over the May 23 meeting, Plaintiff notes that (1) prior to the December 20 interview, Chief Corr

told Malloy that the investigation into Plaintiff  was "significant" and that Plaintiff would litigate

whatever the result, and in response Malloy told Chief Corr that Lexington would defend itself in

court; and (2) prior to the May 23 meeting Chief Corr told Town Manger Malloy that he found

the evidence troubling, but "hopefully [Plaintiff] could offer something helpful in the hearing."

[ECF No. 34 at 8–9, 20; ECF No. 35 at 8–9, 22].  For these reasons, Plaintiff contends that Town

Manager Malloy had already decided to terminate Plaintiff regardless of what evidence was

presented at the hearing.  Despite Plaintiff's assertions, this evidence does not create a genuine

issue of material fact as to whether Plaintiff's termination was predetermined prior to the

hearing.  A statement that Plaintiff's case may end in litigation, which the Town would defend,

without more, does not allow a reasonable jury to conclude that the Town Manager was biased

and that the outcome of the hearing was predetermined.  Further, although Chief Corr made

Town Manager Malloy aware of the investigation and stated that the evidence was troubling,

Chief Corr indicated that his own mind was not made up by stating that "hopefully [Plaintiff]

could offer something helpful in the hearing."  [ECF No. 26-1 at 115].  Aside from Chief Corr's

statement expressing *his* own view, Plaintiff points to no evidence that even suggests that the

*Town Manager* had already decided that Plaintiff should be terminated or that regardless of what

happened at the hearing, he would find that termination was proper.  Cf. Lawless v. Town of

Freetown by & through Thomas, No. 18-cv-11089, 2021 WL 878083, at *10 (D. Mass. Mar. 9, 2021) (finding genuine issue of material fact when decisionmakers held meetings well in advance of the termination hearing indicating they did not trust the plaintiff and were overheard saying "why do we have to do this dog and pony show, let's just vote to terminate her and get it over with."); Duhani, 52 F. Supp. 3d at 183 (finding predetermined nature of the hearing a "close case" where record suggested that decisionmakers wanted to eliminate plaintiff's job in order to create a new position for somebody else).  Chief Corr testified that he never heard Town Manger Malloy state that he had already made a decision about Plaintiff's termination prior to the hearing and Plaintiff identifies no evidence to contradict that testimony.  [ECF No. 26-1 at 115]. Further, the fact that Lexington's labor counsel was involved does not suggest that the Town Manager had already reached a conclusion.  See West, 2016 WL 126743, at *5 (finding that law firm invoices suggesting that attorneys discussed the process for terminating the plaintiff before he was sent notice of his hearing said "nothing of the state of [the decisionmakers'] decision regarding [plaintiff] at his pre-termination hearing").

Though not entirely clear, Plaintiff's final argument in support of his procedural due process argument is that, even though Town Manager Malloy presided over the hearing and issued the termination decision, Chief Corr, who was biased, was the actual decisionmaker. [ECF No. 34 at 19–20].  In support, Plaintiff states that (1) Chief Corr expressed his view on the investigation to the Town Manager; (2) Chief Corr asked to involve Lexington's labor counsel in the investigation; and (3) the Town Manager had never rejected one of Chief Corr's recommendations, including a recommendation that a former policy on nepotism be rescinded. [Id. at 17, 20].  No reasonable factfinder could determine that Chief Corr became the de facto decisionmaker and in control of the outcome of the proceedings simply because he provided

26

information or shared his view of the investigation or because Town Manager Malloy had followed his recommendations in the past. And, aside from Plaintiff's conclusory statements, there is no evidence in the record that would allow a reasonable factfinder to conclude that Chief Corr was actually biased against him to such a degree that Plaintiff was not provided with a fair opportunity to have his case heard.

Accordingly, taking the evidence in the light most favorable to Plaintiff, no genuine issue of material fact exists that would allow a reasonable factfinder to conclude that the outcome of the termination meeting was predetermined or that the decisionmaker was so biased that Plaintiff had no opportunity to present his case. Therefore, Defendants' motions for summary judgment on the procedural due process claim are GRANTED.

2.      Substantive Due Process Violation

"In order to assert a valid substantive due process claim, [a plaintiff has] to prove that [he] suffered the deprivation of an established life, liberty, or property interest, and that such deprivation occurred through governmental action that shocks the conscience." Clark v. Boscher, 514 F.3d 107, 112 (1st Cir. 2008). Whether conduct "shocks the conscience" is a highly fact-specific inquiry, but the First Circuit has instructed that "in order to shock the conscience, conduct must at the very least be extreme and egregious, or . . . truly outrageous, uncivilized, and intolerable." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006) (internal quotation marks and citations omitted).

In support of his substantive due process claim, Plaintiff makes the conclusory assertion that a sham investigation on a "very upsetting and concerning topic" and a failure to "credit any of the actual victim's statements is shocking to the conscience." [ECF No. 35 at 22–23]. Plaintiff has not cited to any cases where an allegedly biased proceeding rises to the level of

conscious shocking conduct, and the cases where substantive due process violations have been found presented dramatically different factual scenarios, often involving physical harm or deprivation of liberty.  Thomas v. Town of Salisbury, 134 F. Supp. 3d 633, 648 (D. Mass. 2015) (collecting cases where substantive due process violations have been found and noting that the defendant officer's allegation of a biased proceeding did not rise to that level).  Therefore, Defendants' motions for summary judgment as to Plaintiff's substantive due process claim are GRANTED.

## IV.    CONCLUSION

Accordingly, Defendants' motions for summary judgment, [ECF Nos. 21, 25], are GRANTED.

**SO ORDERED.**

February 15, 2022                                    /s/ Allison D. Burroughs
                                                     ALLISON D. BURROUGHS
                                                     U.S. DISTRICT JUDGE